## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW M MEXICO

**JOSEPH CRAIG RIPLEY,**

      **Plaintiff,**

    vs.                          **Civ. No. 12-1073 ACT**

**CAROLYN W. COLVIN, Acting Commissioner,**
**Social Security Administration,**

      **Defendant.**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Motion to Reverse or Remand for a Rehearing With Supporting Memorandum ("Motion") of the Plaintiff Joseph Craig Ripley ("Plaintiff"), filed April 22, 2013 [Doc. 15].  On April 26, 2013, Plaintiff filed a Supplement to Motion to Reverse and Remand for a Rehearing. [Doc. 16.] On June 20, 2013, the Commissioner of Social Security ("Defendant") filed a Response [Doc. No. 17], and Plaintiff filed a Reply on July 8, 2013 [Doc. No. 18].  Having considered the Motion, the memoranda submitted by the parties, the administrative record and the applicable law, the Court finds that Plaintiff's Motion is not well taken and will be DENIED.

## I.  PROCEDURAL RECORD

On June 10, 2009, Plaintiff filed an application for Supplemental Security Income ("SSI") under Title  XVI of the Social Security Act, 42 U.S.C. § 1382(a)(3) and an application for Social Security Disability Insurance Benefits ("DIB") under Title  II of the Social Security Act, 42 U.S.C. §§ 401.  [Tr. 147-150, 151-158.]  Plaintiff alleges a disability beginning March 18, 2009, due to a learning disability. [Tr. 183.]  Plaintiff's application was initially

denied on June 28, 2009, and denied again at the reconsideration level on April 9, 2010.
[Tr.  83-84, 94-100.]

 The ALJ conducted a hearing on January 13, 2011. [Tr. 24-82.]  At the hearing, Plaintiff

was represented by Accredited Disability Representative John Bishop.[1]  On April 20, 2011, the

ALJ issued an unfavorable decision.  In his report, the ALJ found that since January 15, 2008,

the Plaintiff had the following severe impairments: borderline intellectual functioning and

personality disorder.  [Tr. 17.]  However, the ALJ concluded that the Plaintiff did not have an

impairment or combination of impairments that met or medically equaled one of the listed

impairments in 20 CFR Part 404, Subpart P, Appendix 1. [Tr. 18.]  The ALJ also found that:

> [Plaintiff] has the residual functional capacity to perform a full range of work at all
> exertional levels with additional nonexertional limitations.  The claimant is limited
> to understanding, remembering, and carrying out simple instructions; making simple
> decisions; maintaining concentration, persistence and pace for up to and including
> 2 hours at a time; and should work primarily with things and not people.

[Tr. 19.]  The ALJ concluded that Plaintiff is capable of performing past relevant work as a dock

worker, and that there are other jobs existing in the national economy that he is also able to

perform. [Tr. 21.]

 On August 23, 2012, the Appeals Council issued its decision denying Plaintiff's request

for review and upholding the final decision of the ALJ. [Tr. 1-3.] On October 18, 2012, the

Plaintiff filed his Complaint for judicial review of the ALJ's decision. [Doc. 1.]

 Plaintiff was born on September 14, 1970. [Tr. 178.]  The Plaintiff graduated from high

school in 1990, and attended community college in Las Vegas, Nevada, for one and a half years.

[Tr. 32, 188.] Plaintiff has work experience as a Merchant Marine, call center representative, cab

---

[1]   Plaintiff is currently represented by Attorney Michael Armstrong.

driver, casino dealer, grocery cashier, convenience store clerk, dock worker and security guard.

[Tr. 30-48, 184.]  Plaintiff has not engaged in any substantial gainful activity since his alleged

onset date of March 18, 2009. [Tr. 17.]

## II.  STANDARD OF REVIEW

Disability under the Social Security Act is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment."  42 U.S.C. § 423(d)(1)(A).  A claimant is disabled under the Act if his "physical or

mental impairment or impairments are of such severity that he is not only unable to do his

previous work but cannot, considering his age, education, and work experience, engage in any

other kind of substantial gainful work in the national economy."  42 U.S.C. § 423(d)(2)(A).  In

order to qualify for disability insurance benefits, a claimant must establish a severe physical or

mental impairment expected to result in death or last for a continuous period of twelve months,

which prevents the claimant from engaging in substantial gainful activity.  42 U.S.C.

§423(d)(1)(A); *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993).   Social Security

regulations implement a five-step sequential process to evaluate a disability claim.  20 C.F.R. §

404.1520.[2]

---

[2]  Step One requires the claimant to establish that she is not engaged in substantial gainful activity, as
defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that she has a medically severe
impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20
C.F.R. § 404.1520(C).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's
impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's
impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Listings").  A
claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is
determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant
must establish that she does not retain the residual functional capacity ("RFC") to perform her past relevant work.  If
the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work
exists in significant numbers in the national economy which the claimant, taking into account her age, education,
work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1183 (10th Cir. 2001).  Disability
benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant
work does not preclude alternative work.  20 C.F.R. § 404.1520.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) to two inquiries: first, whether the decision was supported by substantial evidence; and second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted). Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id.* (quoting *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994)). The court "may neither reweigh the evidence nor substitute" its opinion for that of the Commissioner. *Hamlin*, 365 F.3d at 1214 (quotation omitted).

### III.  MEDICAL HISTORY

Plaintiff alleges a disability beginning March 18, 2009, due to a learning disability. [Tr. 183.] He states as follows:

> I was born with Wolfe Parkinson White syndrome.[3] When I was in the [N]avy I had open heart surgery related to that condition. I had congestive heart failure at 4 ½ months old, as a result, I had minimal brain damage. I can't hardly write more than my name and address. I have problems with my social life as a result of my learning disabilities. When it comes to issues with math, I can be explained a problem and it won't make sense. I have a hard time transitioning. I have zero math skills. I have been in learning disabled classes my whole life. It['s] hard for me to maintain a job. For instance my security jobs suffered because I had to do a lot of handwriting for shift reports and stuff, it was difficult for me.

[Tr. 183.]

---

[3] Wolff-Parkinson-White syndrome is a heart condition in which there is an abnormal extra electrical pathway of the heart. The condition can lead to episodes of rapid heart rate (tachycardia). Wolff-Parkinson-White syndrome is one of the most common causes of fast heart rate disorders in infants and children. http://www.nlm.nih.gov/medlineplus/ency/article/000151.htm

The Plaintiff reported to Social Security that he stopped working his last job as a security guard with Legit Security because "[t]he company was going under." [Tr. 44-45, 183.]

### A.   Jean M. B. Moure, M.D. - Neurological Consultation

On March 21, 1977, Plaintiff was referred by the Klein Independent School District to Neurologist Jean M. B. Moure. [Tr. 308.] Plaintiff's chief complaints were difficulty with coordination and mild behavior problems. [Tr. 308.] Dr. Moure's impression was as follows:

> This child has poor coordination, especially of the right side. By history, he has a short attention span. On examination, there is a moderate visual perceptual deficit with a short visual memory. The auditory memory is adequate. The intelligence is average. The E.E.G. is normal. The above findings suggest the possibility of some cerebral dysfunction or some brain injury. It is possible that he may have suffered some anoxia at the time of the cardiac failure when he was four and one-half months old.

[Tr. 309, 335.] Dr. Moure recommended special education classes.

### B.   Klein Independent School District  - Comprehensive Individual Assessment Report

On August 26, 1986, Plaintiff was referred for an initial evaluation to determine whether he had a learning disability and required special education. [Tr. 297.] A comprehensive assessment was conducted using the Bender Visual Motor Gestalt Test, Weschler Intelligence Scale for Children, Woodcock-Johnson Psyche-Educational Test Battery, Test of Written Language, Wide Range Achievement Test, and Human Figure Drawing. The results of the evaluation were as follows:

Language Functioning:

> . . . [Plaintiff's] language proficiency when compared with age mates may be regarded as average in listening comprehension, average in oral expression, average in reading comprehension, and below average in written expression. . . . Observations of [Plaintiff's] language functioning indicate that he expresses himself best in oral speech. He does not have an identified communication disorder.

. . .

Intellectual/Adaptive Behavior Functioning:

Relative strengths identified include: long term memory of factual data; knowledge of concrete, functional relationships.   Relative weaknesses identified include: immediate auditory memory for details; willingness and/or ability to respond to social rules; visual-motor control; motor speed and accuracy; distractability. . . . [Plaintiff] meets most of the social and physical demands of the environment. [Plaintiff's] adaptive behavior appears to be consistent with his measured level of intelligence.

. . .

Learning Disability:

[Plaintiff's] level of intellectual functioning is within the normal range as measured by the WISC-R.  Although [Plaintiff] has had appropriate learning experiences in these areas, a severe discrepancy now exists between intellectual functioning and achievement in written expression, mathematics calculation, and mathematics reasoning. . . . [Plaintiff] appears to meet federal and state eligibility criteria for a learning disability in . . . written expression, math calculation, and math reasoning.

[Tr. 297-306.]

C.      **Psychiatric Review Technique - Dr. Elizabeth Chiang**

On July 27, 2009, State agency medical consultant Dr. Elizabeth Chiang prepared a

Psychiatric Review Technique based on her review of Plaintiff's medical records. [Tr. 311-323.]

Dr. Chiang's notes state as follows:

38 y/o initial concurrent claim; alleges learning disability due to Wolfe Parkinson-White Syndrome.

There's a psych evaluation when claimant was 15 y/o.  His IQ scores at that time were Verbal = 94, Performance = 75, Full Scale = 84.  He was found to qualify for learning disability for mathematics calculation, reasoning and written expression.

Otherwise since this time, claimant was eligible and served in the military, has held a job for 1 year as a casino dealer, 11 months as a call center help desk representative for DELL computers, a cab driver for 2 years, a merchant marine for 2 years and a security guard for 2 years.  Claimant has demonstrated longevity in semi-skilled work.

Field office notes claimant is friendly and that there are no problems with understanding, concentrating, talking or answering.

Claimant is independent in ADL's, surfs the internet, operates and plays computer games, goes to "kung fu" and the gym for workouts.

There's no psych mdi.

[Tr. 323.]

### D.     <u>Psychological Evaluation - Eligio R. Padilla, Ph.D.</u>

On September 11, 2009, Plaintiff was referred by Dr. Stephen Chiulli to Eligio R. Padilla, Ph.D., for a psychological evaluation. [Tr. 325.] Dr. Padilla's method of evaluation consisted of an interview with Plaintiff, a mental status examination, a review of records, a brief interview with Plaintiff's mother, and the administration of the Wechsler Adult Intelligence Scale (WAIS-III) and the Wide Range Achievement Test - 3 (WRAT3). [Id.] Dr. Padilla's clinical impressions and prognosis states as follows:

> [Plaintiff] admits to getting agitated because of what other people say and do, but is not voicing any particular psychological distress regarding his own psychological status, his thinking, his attitudes, his emotions, his behavior or his future. On the other hand, [Plaintiff's mother] expresses great concern about her son and his future, recognizing that his behavior is dysfunctional, interferes with daily living, prevents the establishment of meaningful relationships outside his immediate family and interferes with his ability to be productive and self-sufficient. . . . While [Plaintiff] did not meet criteria for any particular personality disorder, he displays features of several personality disorders as described in the DSM, including schizoid, antisocial and narcissistic personality disorders, among others, and the diagnosis of personality disorder NOS is presented on Axis II along with the diagnosis of borderline intellectual functioning.
>
> . . .
>
> Given his very low Full Scale IQ, his extremely low Working Memory Index, his very low Processing Speed and Perceptual Reasoning indices, his relatively low academic skills (especially in arithmetic), his personality disorder, his rigid thinking, his history of poor interpersonal relationships, his social isolation and limited need for affiliation, his extremely low frustration tolerance, his poor work history and his dependency on his parents, his prognosis is guarded and is more likely poor. . . .

Dr. Padilla diagnosed Plaintiff as follows:

| | |
|---|---|
| Axis I: | Personality Disorder NOS |
| Axis II: | Borderline Intellectual Functioning |
| Axis III: | Obesity |
| Axis IV: | Unemployment, dependency, isolation, poor peer relations |
| Axis V: | GAF: 45[4] |

[Tr. 330.]

Dr. Padilla prepared a Psychological Source Statement of Ability to Do Work-Related Activities. [Tr. 332-333.]  Dr. Padilla assessed that Plaintiff has marked limitations affecting his ability to (1) understand and remember detailed or complex instructions; (2) sustain concentration and task persistence; (3) work without supervision; (4) interact with coworkers; (5) interact with supervisors; and (6) adapt to changes in workplace.  Dr. Padilla assessed that Plaintiff has moderate limitations affecting his ability to (1) carry out instructions; and (2) interact with the public.  Finally, Dr. Padilla assessed that Plaintiff has mild limitations affecting his ability to (1) understand and remember very short and simple instructions; (2) be aware of normal hazards and react appropriately; and (3) use public transportation or travel to unfamiliar places. [Tr. 332.]

---

[4] Individuals with a GAF between 41 and 50 have serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job).

**E.**     **Mental Residual Functional Capacity Assessment - Renate Wewerka, Ph.D.**

On April 8, 2010, Renate Wewerka, Ph.D., prepared a Mental Residual Functional

Capacity Assessment based on her review of Plaintiff's medical records. [Tr. 273-280.]

Dr. Wewerka commented as follows:

> As explained in the [Psychiatric Review Technique Form] narrative and contrary to
> the opinion of the independent provider (who has only seen claimant once), this
> claimant can understand, remember, and carry out at least simple instructions, make
> simple decisions, attend and concentrate for 2 hours at a time, interact adequately
> with co-workers and supervisors, and respond appropriately to change in a routine
> work setting.  He will function best in work that does not require significant
> interactions with supervisors and co-workers and where change is not a frequent
> occurrence.

[Tr. 340.] Dr. Wewerka assessed that Plaintiff was markedly limited in his ability to carry out

detailed instructions. [Tr. 338.] Dr. Wewerka assessed that Plaintiff was moderately limited in

his ability to (1) understand and remember detailed instructions; (2) maintain attention and

concentration for extended periods; (3) perform activities within a schedule, maintain regular

attendance, and be punctual within customary tolerances; (4) work in coordination with or

proximity to others without being distracted by them; (5) make simple work-related decisions;

(6) complete a normal workday and workweek without interruptions from psychologically based

symptoms and to perform at a consistent pace without an unreasonable number and length of rest

periods; (7) interact appropriately with the general public; (8) accept instructions and respond

appropriately to criticism from supervisors; (9) get along with coworkers or peers without

distracting them or exhibiting behavioral extremes; (10) maintain socially appropriate behavior

and to adhere to basic standards of neatness and cleanliness; (11) respond appropriately to

changes in the work setting; and (12) set realistic goals or make plans independently of others.

[Tr. 338-339.] Dr. Wewerka assessed that Plaintiff was not significantly limited in his ability to

9

(1) remember locations and work-like procedures; (2) carry out very short and simple instructions; (3) sustain an ordinary routine without special supervision; (4) ask simple questions or request assistance; (5) be aware of normal hazards and take appropriate precautions; and (6) travel to unfamiliar places or use public transportation.  [Id.]

### F.    Psychiatric Review Technique - Renate Wewerka, Ph.D.

On April 8, 2009, State agency medical consultant Dr. Renate Wewerka prepared a Psychiatric Review Technique based on her review of Plaintiff's medical records. [Tr. 342-355.] Dr. Wewerka's notes state as follows:

> This 39 y/o claimant is alleging disability on the [learning disability] and various cardiac problems as a youth. . . .  His mother alleges that as a young child he experienced an episode of heart failure and was diagnosed with Wolf-Parkinson-White arrhythmia.  She thinks that he may have suffered from some mild damage from hypoxia at that time.   He was treated for the arrhythmia potential conservatively but underwent ablation surgery just prior to entering the Navy and a second procedure 2 years later.  He takes no meds for this problem at the present time.

> His family moved a lot during his school years and he attended many schools and in many countries.  He struggled academically, especially in English and math but was able to work with computers.  He received SpEd services for LD and testing when he was nearly 16 with the WISC-R on 8/14/86 documented [Verbal]-94, [Performance Scale]-75, [Full Scale]-84.  WJ-II at the same time noted reading-87, math-74, and written expression-90.  After high school, he went to community college for a few courses, enlisted in the Navy, left on a medical discharge, and has since worked as a casino dealer for a year, at a call center for 11 months, as a cab driver for 2 years, and most recently as a security guard for 2 years.  His mother indicated that he is often fired for getting into arguments with supervisors, etc.  She describes him as easily annoyed, rigid, conservative in his thinking, and intolerant of others.  He is quick to anger and fails to see the other's point of view.  He is very large/obese and can be intimidating when angered.  Mother alleges that in the 4 years that he has lived in Santa Fe with his father, he has made no friends and has even been kicked out of multiple coffee houses in Santa Fe due to his intolerance of values and life styles that are not conservative.  He does, however, have multiple interests (goes to the gym to work out, enjoys tai chi, enjoys internet gaming) and is not afraid of crowds. . . .

On reconsideration his parents had him seen for an independent psych evaluation prior to pursuing an appeal and that report was provided to the DDS. . . .  He presented casually dressed in rumpled attire with adequate grooming/hygiene. Attention, concentration, and memory were only mildly impaired and he was fully oriented.  He was cooperative, had good eye contact and demonstrated a euthymic mood and affect.  His thoughts tended to be scattered but his communication was quite comprehensible.  There was no evidence of any abnormal thinking.  He did seem to have problems with decision-making, judgment and insight but otherwise executive functioning was intact.  He can manage all ADLs independently but seems to not place great important on them.  He occasionally visits other family members, but other than parents seems to only interact on-line.  WAIS-4 was consistent with the earlier IQ testing: [Verbal Comprehension]-93, [Perceptual Reasoning]-77, [Working Memory]-58, [Processing Speed]-71, [Full Scale]-72, [General Ability]-82.  His Working Memory score of 58 was abnormally low because he only scored a 1 on digit span (somewhat suspect and it is felt that his General Ability score better reflects his intellectual functioning even though he was diagnosed with borderline intellectual functioning).  WRAT-3 achievement testing was also consistent with the past (Read-81, Spell-83, Math-60), consistent with the prior diagnosis of learning disability.  Additionally the psychologist felt that his MSE/history was consistent with a personality disorder NOS with schizoid, antisocial, and narcissistic features. While Dr. Padilla concluded that the claimant was markedly impaired for working with co-workers and supervisors, his work history documents that he has been able to sustain work with others for upwards of 2 years at a time but was most successful when there was little interaction with co-workers/supervisors (security).  Dr. Padilla also felt that his ability for CCP as well as adapting to change were markedly impaired, but again his work history does not support that level of severity.

[Tr. 354.]

Dr. Wewerka assessed that Plaintiff has moderate functional limitations in his

(1) activities of daily living; (2) social functioning; and (3) ability to maintain concentration,

persistence, or pace.  [Tr. 352.]

### G.    Vocational Evaluation - David Montoya, C.V.E.

On January 25, 2011, Plaintiff underwent an evaluation to assess his dexterity

capabilities. [Tr. 282.] David Montoya administered two dexterity tests which he states indicated

Plaintiff has a profound impairment with regard to performing operations involving fine motor

dexterity and eye-hand coordination. [Tr. 283.]  Mr. Montoya assessed this "will have a

profound effect on productivity in occupational settings which would require the use of his hands to perform fine and gross motor dexterity operations." [Id.]

<u>**ANALYSIS**</u>

Plaintiff asks this Court to address three issues on review.  First, that the ALJ's finding that Plaintiff can do past relevant work as a dock worker is unsupported by the substantial evidence and that the ALJ failed to perform the legally required analysis in making that finding. [Doc. 15 at 4.] Second, that the ALJ's finding that Plaintiff can perform other work in the national economy is contrary to the substantial evidence of record.  And third, that the ALJ's credibility determination is contrary to law.

A.    <u>**Step Four Findings - Residual Functional Capacity**</u>

Plaintiff's first argument generally states that the ALJ failed to perform the three-tiered analysis in finding that Plaintiff can do his past work as a dock worker. [Doc. 15 at 5.]   More specifically, Plaintiff contends that the ALJ failed to properly determine Plaintiff's RFC because he failed to explain the weight given to medical opinions, failed to develop the record regarding his dexterity impairment, and failed to include all of the limitations from Plaintiff's intellectual functioning and mental impairment in the RFC.  Plaintiff further contends that the ALJ failed to develop the record with factual information concerning the demands of Plaintiff's past work as a dock worker.

Step four of the sequential analysis is comprised of three phases.  In the first phase, the ALJ must evaluate a claimant's physical and mental residual functional capacity.  *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996).  In the second phase, he must determine the physical and mental demands of the claimant's past relevant work.  *Id.*  In the final phase, the

ALJ determines whether the claimant has the ability to meet the job demands found in phase two despite the mental and/or physical limitations found in phase one.  *Id.*

### 1.   ALJ's RFC Assessment

In determining a claimant's physical abilities, the ALJ should "first assess the nature and extent of [the claimant's] physical limitations and then determine [the claimant's] residual functional capacity for work activity on a regular and continuing basis."  20 C.F.R. § 404.1545(b).  The ALJ is required to consider all of the claimant's impairments, including impairments that are not severe.  *See* 20 C.F.R. §§ 404.1545(d) , 416.945; *see also Wilson v. Astrue*, 602 F.3d 1136, 1140 (10th Cir. 2010).  "[T]he ALJ must make specific [RFC] findings." *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). And those findings "must be supported by substantial evidence." *Haddock v. Apfel*, 196 F.3d 1084, 1088 (10th Cir. 1999). The RFC assessment must include a narrative discussion as follows:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).  In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual case perform based on the evidence available in the case record.  The adjudicator must also explain how any material inconsistences or ambiguities in the evidence in the case record were considered and resolved.
>
> . . .
>
> The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.

SSR 96-8p, 1996 WL 374184, at *7.

Here, the ALJ's analysis meets these standards.  The ALJ determined as follows:

13

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels with additional nonexertional limitations.  The claimant is limited to understanding, remembering, and carrying out simple instructions; making simple decisions; maintaining concentration, persistence, and pace for up to and including 2 hours at a time; and should work primarily with things and not people.

[Tr. 19.]  In making his RFC determination, the ALJ considered the claimant's severe impairments, and made specific findings for each that were supported by substantial evidence.  The ALJ provided a narrative discussion describing how the evidence supports his conclusions, and cited to specific medical facts as well as nonmedical evidence.  As such, Plaintiff's argument that the ALJ's finding that Plaintiff has a residual functional capacity to perform a full range of work at all exertional levels with additional nonexertional limitations is unsupported by the evidence fails.

### a.  <u>Weight Given to Nontreating and Nonexamining Sources</u>

Plaintiff argues that the ALJ failed to explain why he gave "great weight" to the nonexamining doctor opinions and only "considerable weight" the opinion of Eligio Padilla, the psychologist who evaluated Plaintiff in person.  Here, the ALJ properly evaluated every medical opinion available and determined what weight should be given to each in accordance with 20 C.F.R. § 416.927(c)(1)-(6) and 20 C.F.R. § 404.1567(c)(1)-(6).  In his determination, the ALJ summarized Dr. Padilla's findings, discussed in detail the limitations he assessed, and concluded that, "I give considerable weight to this opinion and find it consistent with the residual functional capacity set forth above." [Tr. 20.]  The ALJ further stated that he found the mental residual functional capacity and psychiatric review techniques by Dr. Renate Wewerka and Dr. Elizabeth Chiang to be comprehensive and well-reasoned reviews of the evidence and as such he gave "great weight" to their opinions. [Tr. 20-21.]  To the extent Plaintiff suggests Dr. Padilla's

14

opinion should be weighted deferentially,  "[t]he opinion of an examining physician [(a nontreating source)] who only saw the claimant once is not entitled to the sort of deferential treatment accorded to a treating physician's opinion."  *Doyal v. Barnhart*, 331 F.3d 758, 763 (10th Cir. 2003)(quoting *Reid v. Chater*, 71 F.3d 372, 374 (10th Cir. 1995)); *see also* 20 C.F.R. 416.902 and 404.1502, and SSR 96-6p, 1996 WL 374180 (opinions from state agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources).

Plaintiff further argues that the ALJ mischaracterized Dr. Padilla's findings by grouping the findings in each respective category; *i.e.*, Plaintiff is "moderately to markedly limited in social interactions" and "mildly to markedly limited in his ability to adapt," etc.  [Doc. 15 at 10.] The Court does not find that the ALJ's style of describing Plaintiff's limitations  results in any mischaracterization because the ALJ properly accounted for Plaintiff's exertional and nonexertional limitations in his RFC assessment as represented in the medical opinions of record and by the testimony received.  The ALJ specifically cited to Plaintiff's diverse work background, his participation in weight training, his walking, riding a bike and taking martial arts classes, and that Plaintiff testified he can concentrate on specific problems for up to three hours at a time. [Tr. 19-20.]  The ALJ also specifically cited to Plaintiff's problems with his memory, difficulties with concentration, his difficulty interfacing with people, his lack of social skills, his strong will, and his poor interpersonal skills. [Tr. 19]  To that end, the ALJ determined that Plaintiff has the residual functional capacity to perform a full range of work at all exertional levels with nonexertional limitations of understanding, remembering, and carrying out simple instructions; making simple decisions; maintaining concentration, persistence, and pace for up to and including 2 hours at a time; and should work primarily with things and not people.  The

nonexertional limitations take into account the areas where Dr. Padilla and Dr. Wewerka found moderate and marked limitations in Plaintiff's nonexertional abilities.

### b.   <u>Dexterity Impairment and Duty to Develop the Record</u>

Plaintiff contends that the ALJ failed to develop the record regarding Plaintiff's dexterity impairment and should have ordered a consultative exam.  In disability proceedings, the Social Security Administration bears a duty to develop the record.  *Wall v. Astrue*, 561 F.3d 1048, 1062-63 (10th Cir. 2009).  But to trigger this duty, the claimant must raise the issue to be developed and that issue must be substantial on its face.  *Id.* at 1063.  As a result, the claimant must ensure that the record contains evidence suggesting a reasonable possibility of a severe impairment.  *Id.*  In deciding whether the record is sufficient, the Court must consider whether objective evidence suggests a condition which could materially affect the disability decision and require further investigation.  *Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir. 1997).

Here, the ALJ did not violate the duty to develop the record on Plaintiff's dexterity impairment because the ALJ could reasonably assume for several reasons that a dexterity impairment would not bear on the disability claim.  First, Plaintiff did not claim an inability to work because of a dexterity impairment.  Second, the ALJ noted there are no medical records evidencing that Plaintiff ever sought treatment regarding a dexterity impairment. [Tr. 18.]  Third, after Plaintiff raised the issue of his dexterity impairment at the hearing, the ALJ left the record open for thirty (30) days so that Plaintiff could submit supporting evidence. [Tr. 18.] Fourth, the only evidence submitted by Plaintiff in that thirty-day period was an evaluation by David Montoya, a Certified Vocational Evaluator, which the ALJ considered and afforded no weight because Mr. Montoya was not an acceptable medical source and his evaluation contradicted Plaintiff's past work history.  [Tr. 18.]   Fifth, the ALJ stated that Plaintiff had held many jobs

16

that required manual dexterity, and the record indicates Plaintiff did not leave nor was he ever fired from a job because of a dexterity impairment. [Tr. 18, 31-32, 34-35, 37-38, 40.]  Sixth, the ALJ reviewed the Plaintiff's school records from 1977 to 1986, which included Dr. Moure's neurologic consultation, and determined they were too remote to be relevant to Plaintiff's current claim. [Tr. 20.]  Seventh, the record indicates that Plaintiff's primary complaint regarding his dexterity impairment is his difficulty in using writing instruments, but that he is able to use a keyboard for typing and playing computer games, ride a bike, and practice martial arts.  [Tr. 58, 72-73, 207.]  Given the ALJ's discussion regarding his findings, coupled with the lack of evidence in the record regarding Plaintiff's dexterity impairment, the record does not suggest a reasonable possibility of impairment and is insufficient to trigger the agency's duty to further develop the record.  For these same reasons, there was no need for the ALJ to order a consultative examination of Plaintiff's hands.  *See* 20 C.F.R. § 404.1519a and 20 C.F.R. § 416.919a.

### c.      Limitations from Intellectual and Mental Impairment

Plaintiff asserts that the ALJ failed to include all of Plaintiff's limitations regarding his intellectual functioning and mental impairment in determining Plaintiff's RFC.  Contrary to Plaintiff's argument, the ALJ did not ignore Dr. Padilla's findings, but gave them considerable weight.  As previously stated, the ALJ specifically cited to Plaintiff's problems with his memory, difficulties with concentration, his difficulty interfacing with people, his lack of social skills, his strong will, and his poor interpersonal skills. [Tr. 19]  The ALJ included these nonexertional limitations in determining Plaintiff's RFC.  Furthermore, Plaintiff's contention that the ALJ should have discussed the hypothetical presented to the vocational expert by Plaintiff's representative at the hearing that Plaintiff responds inappropriately to supervisors or is

17

interrupted by psychological symptoms "ten percent" of the time is not supported by the evidence.  A hypothetical must include only those impairments which actually exist and are supported by substantial evidence.  *See Barnett v. Apfel*, 231 F.3d 687 (10th Cir. 2000)(holding that hypothetical questions are sufficient when they contain all the limitations found to exist and exclude conditions not supported by the evidence); and see Decker v. Chater, 86 F.3d 953, 955 (10th Cir. 1996)(a hypothetical question need only reflect impairments and limitations that are borne out by the evidentiary record).  Here, while Dr. Padilla and Dr. Wewerka indicated that Plaintiff had marked and moderate limitations in his ability to interact with supervisors, neither of them quantified that Plaintiff responds inappropriately to supervisors or is interrupted by psychological symptoms "ten percent" of the time.  The ALJ included all of Plaintiff's limitations regarding his intellectual functioning and mental impairment in determining Plaintiff's RFC and in presenting his hypothetical to the VE.

### 2. **Demands of Plaintiff's Past Relevant Work**

Plaintiff contends that the ALJ failed to engage in any evidentiary discussion in concluding that Plaintiff can return to his past work as a dock worker and that he merely relied on the testimony of the vocational expert. [Doc. 15 at 19.] At the second and third phases of the step four analysis, the ALJ must make findings regarding the physical and mental demands of the claimant's past relevant work.  *Winfrey*, 92 F.3d at 1024.  To make the necessary findings, the ALJ must obtain adequate "factual information about those work demands which have a bearing on the medically established limitations."  *Id.*  When the claimant has a mental impairment:

> [C]are must be taken to obtain a precise description of the particular job duties which are likely to produce tension and anxiety, *e.g.*, speed, precision, complexity of tasks,

18

independent judgments, working with other people, etc., in order to determine if the
claimant's mental impairment is compatible with the performance of such work."

*Id.* (quoting SSR 82-62, Soc. Sec. Rep. Serv. 809, 1982 WL 31386, *3).  Plaintiff argues that the

ALJ failed to develop the demands of his past work as a dock worker and minimized the impact

of Plaintiff's mental impairment on his functioning.  The undersigned, however, finds that the

ALJ did inquire regarding Plaintiff's past relevant work, including his work as a dock worker.

[Tr. 31-47.]  The ALJ specifically questioned the Plaintiff about his job as a dock worker as

follows:

| | | |
|---|---|---|
| ALJ: | | And I see on your most recently filed application that you also indicated that you worked at Sears as a dock worker? |
| Claimant: | | Yeah. |
| ALJ: | | Can you tell me about that? |
| Claimant: | | Pretty much seasonal; Christmas time. |
| ALJ: | | Okay.  And you loaded and unloaded trucks? |
| Claimant: | | Yeah. |
| ALJ: | | And what was the heaviest item that you had to lift, unassisted, by yourself? |
| Claimant: | | The latest washer and dryer – if you notice in the ads, front load washers and dryers that they have that look real polished – that was the heaviest. |
| ALJ: | | Okay.  And you lifted those by hand yourself? |
| Claimant: | | No. |
| ALJ: | | You used the lift? |
| Claimant: | | Yeah.  A hand truck. |
| ALJ: | | Okay.  What about items that you would lift manually? |

19

> Claimant:   Manually I've been able to pull 80 pounds reasonably, you know, proper lifting.

[Tr. 37.]  When Plaintiff was further questioned about this job by his representative, Plaintiff explained that he voluntarily left his employment with Sears because he did not like being interrupted while focused on a particular task.  [Tr. 49-50.]

After questioning Plaintiff extensively about his past relevant work, the ALJ asked the Vocational Expert to identify the exertional and skill level of claimant's work performed within the past 15 years -- which included cab driver, casino dealer, help desk representative, security guard, grocery cashier, convenience store clerk, dock worker and pizza delivery.  The ALJ then asked the following hypothetical:

> I'd like you to assume a claimant of the same age, education, and work experience as our claimant here, and if such person had limits such that he could be expected to understand, remember and carry out simple instructions, to make simple decisions, maintain concentration, persistence and pace for up to and including two hours, and that such person would work primarily with things and not people.  Would such a person be able to perform any of claimant's past work?

[Tr. 72.]   The Vocational Expert testified that according to the <u>Dictionary of Occupational Titles</u> selected characteristics, the job of dock worker would be the only one that would fit that hypothetical. [Tr. 72.]  The question here is whether the ALJ adequately inquired into the physical and mental demands of any past relevant work and whether the VE's testimony served as substantial evidence supporting the ALJ's finding that the claimant could return to that past relevant work.  Here, the ALJ presented a proper hypothetical question relating with precision all of the claimant's impairment.  As such, the Vocational Expert's testimony constitutes substantial evidence.  *See Sitsler v. Astrue*, 410 Fed.Appx. 112, 120, 2011 WL 62834, *7 (C.A. 10 (Okla.))(citing *Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir. 1991)).  For these reasons, the

ALJ's determination that Plaintiff can return to his past relevant work as a dock worker is supported by substantial evidence.

Because the ALJ evaluated Plaintiff's physical and mental residual functional capacity, determined the physical and mental demands of the Plaintiff's past relevant work, and determined that Plaintiff has the ability to meet the job demands of a dock worker, the ALJ correctly performed the three-tiered analysis in finding that Plaintiff can do his past relevant work.

### B.    Step Five Findings

Plaintiff argues at step five as follows:

> Upon cross-examination the VE testified that the inability to concentrate for two hours at a time would eliminate the three jobs.  The VE testified that the inability to respond appropriately to supervisors for 10% of the time also would eliminate the jobs.  The ALJ failed to discuss this VE testimony, and did not explain why he failed to adopt the finding of Dr. Padilla and of non-examining Dr. Wewerka that Mr. Ripley could not adapt to workplace changes.

[Doc. 15 at 21.] The Court does not find Plaintiff's argument compelling.  Here, the ALJ stated that he gave considerable weight to Dr. Padilla's opinion and great weight to Dr. Wewerka's opinion.  As previously stated, neither of them quantified that Plaintiff responds inappropriately to supervisors or is interrupted by psychological symptoms "ten percent" of the time. Furthermore, the ALJ noted in his determination that Plaintiff testified that he can concentrate for up to *three* hours. [Tr. 19, 55.] Thus, the additional limitations posed by Plaintiff's representative to the Vocational Expert were not supported by the evidence.  A hypothetical question need only reflect impairments and limitations that are borne out by the evidentiary records. *Decker,* 86 F.3d at 955.  The ALJ included all of Plaintiff's limitations regarding his intellectual functioning and mental impairment in determining Plaintiff's RFC and in the

hypothetical he presented to the Vocational Expert.  As such, the Vocational Expert's testimony constitutes substantial evidence.  *See Sitsler,*  410 Fed.Appx. at 120.  For these reasons, the ALJ's determination that there are a significant number of jobs as enumerated by the Vocational Expert in the national economy that the Plaintiff can perform is supported by substantial evidence.

### C. <u>Credibility</u>

Finally, the Plaintiff argues that the ALJ failed to properly assess Plaintiff's credibility and failed to considered factors pursuant to Social Security Rule 96-7p, 1996 WL 374186.  The Court disagrees.  The ALJ is "the individual optimally positioned to observe and assess witness credibility."  *Casias v. Sec'y of Health & Human Servs*., 933 F.2d 799, 801 (10th Cir. 1991).  "Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determination when supported by substantial evidence."  *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995)(quotation omitted).  The ALJ must cite specific evidence relevant to the factors used in evaluating a claimant's subjective complaints, and explain why if he concludes those complaints are not credible.  *See id.; see also* Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *4 (stating that credibility determinations cannot be based on "intangible or intuitive" reasons, but "must be grounded in the evidence and articulated in the determination or decision").  This process, however, "does not require a formalistic factor-by-factor recitation of the evidence."  *Qualls v. Apfel*, 206 F.3d 1368, 1372 910th Cir. 2000).  While the Court appreciates how the boilerplate language used by the ALJ can suggest that credibility is determined in light of a predetermined RFC, that is not the case here.  Here, the ALJ notes that he "must make a finding on the credibility of the statements based on a consideration of the entire case record." [Tr. 20.] To that end, the ALJ indicates that the Plaintiff had supplied no

medical evidence and the record consists of evaluations prepared by Disability Determination Services professionals, evaluations which he fully considered. [Id.] The ALJ identified Plaintiff's daily activities that include working on his computer, playing computer games, weight training, walking, riding his bike, and taking martial arts classes. [Tr. 19.] The ALJ considered Plaintiff's testimony regarding his diverse work background and education.  [Id.] Because the ALJ's credibility evaluation is supported by substantial evidence, it is not this Court's prerogative to disturb it.

## CONCLUSION

For all of the foregoing reasons, this Court finds that the ALJ's determination is supported by substantial evidence and that correct legal standards were applied.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion to Reverse or Remand Administrative Decision [Doc. 15] is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Complaint is **DISMISSED WITH PREJUDICE**.


_____
**ALAN C. TORGERSON**
**United States Magistrate Judge,**
**Presiding by Consent**